UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                              ::
JOHANY FRANCISCO,                                             :          04 CV 1605 (ARR)
                                                              :
                    Plaintiff,                                :          NOT FOR
                                                              :          PUBLICATION
      -against-                                               :
                                                              :          OPINION AND ORDER
JO ANNE B. BARNHART, Commissioner of Social                  :
Security,                                                     :
                                                              :
                    Defendant.                                :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

    Plaintiff Johany Francisco ("Francisco" or "plaintiff") applied to the Social Security

Administration (the "SSA") for Supplemental Security Income ("SSI") payments on March 26,

2001, complaining of an uncontrolled seizure disorder and alleging onset on November 14,

2000.[1]  Plaintiff was represented by counsel during the administrative proceedings.  Plaintiff's

application was denied initially on August 10, 2001.  At plaintiff's request, a hearing before

Administrative Law Judge Jane Polisar (the "ALJ") was held on June 11, 2003.  In a decision

dated August 28, 2003, the ALJ concluded that plaintiff was not disabled under the Social

Security Act (the "Act").  On February 17, 2004, the Appeals Council denied Francisco's

request for review, and the ALJ's findings thus became the final decision of the Commissioner

of Social Security (the "Commissioner").  The plaintiff then timely commenced this action in

the district court, seeking review of the Commissioner's final decision.  The defendant Jo Anne

---

[1]While plaintiff's application for SSI indicates an onset date of November 14, 2000, Tr.
46, a disability report she completed on the same day she submitted her application states that she
first became unable to work on September 1, 1999.  Id. at 57.

B. Barnhart, Commissioner of Social Security, has filed a motion for judgment on the pleadings. The plaintiff opposes and cross-moves for judgment on the pleadings, seeking remand for calculation of benefits. For the reasons explained below, the court grants defendant's motion for judgment on the pleadings and denies plaintiff's cross-motion, affirming the Commissioner's decision.

## DISCUSSION

I.    Summary of the Evidence

Plaintiff was born in the Dominican Republic in 1972 and moved to the United States in 1988. She continued her schooling in the United States, completing the eighth grade. Plaintiff does not have significant employment history, having worked at McDonald's for a short period of time and at a garment factory for several months.

Plaintiff apparently suffered her first seizure in September 1999 while she was pregnant. On July 24, 2000, plaintiff went to Woodhull Hospital ("Woodhull") for a routine physical. She reported a history of two seizures but denied head injuries. Tr. 90. The doctor referred her to the neurology clinic for evaluation. Tr. 89. The following month, on August 21, 2000, Dr. Abdel Ammoumi saw plaintiff in the Adult Neurology Clinic at Woodhull. Tr. 91. Plaintiff reported a history of pre-eclamptic seizure ten months earlier and two subsequent episodes of loss of consciousness. Id. Dr. Ammoumi concluded that plaintiff had suffered from seizures on three occasions, ordered a CT-scan of the head, and prescribed Dilantin. Id.

Plaintiff went to the emergency room on September 9, 2000 to be treated for gonorrhea, at which time she reported that the most recent seizure had occurred four months earlier. Tr. 94. Plaintiff returned to neurology clinic on September 25, 2000. Tr. 92. She reported no

complaints or problems. Id. She told the doctor that Dilantin is expensive and stated that she sometimes did not take it. Id. Dr. Ammoumi renewed plaintiff's Dilantin prescription. Id.

Dr. Ljubomir Vujovic of the Woodhull Medical and Mental Health Center completed an employability report on November 11, 2000. Tr. 99. He indicated that plaintiff suffers from a seizure disorder with an onset date of September 1999 and that she was unable to work. Id.

Nurse Janet Marshall saw plaintiff on December 15, 2000. Nurse Marshall noted that plaintiff was taking Dilantin and that her seizure disorder was asymptomatic. Tr. 144. Several months later, on March 23, 2001, Dr. Oanh Tran saw plaintiff at Woodhull for her regular visit. Tr. 88. Dr. Tran noted that plaintiff complained of a seizure the previous week even though she was on Dilantin. Id. He referred plaintiff to the neurology clinic and recommended that she continue to take Dilantin. Id.

A social security form completed on April 6, 2001 by C. Petion, a non-medical consultant, reports that plaintiff complained of suffering twenty seizures during the month of March. Tr. 80. The report also stated that plaintiff had no recollection of the seizures and no witnesses. Id. Plaintiff had not visited the emergency room in the last month. Id.

Dr. Tran saw plaintiff next on June 25, 2001, at which point plaintiff reported that her most recent seizure had occurred the previous month. Tr. 142. Dr. Tran noted that the level of Dilantin in plaintiff's blood was less than 0.50 milligrams per milliliter. Id.

On June 30, 2001, Dr. Vujovic completed a medical questionnaire for plaintiff. Tr. 102-07. Dr. Vujovic diagnosed plaintiff with seizure disorder and post eclamptic syndrome. Id. at 102. He noted that plaintiff reported her most recent seizure to have occurred the

3

previous month. He found few limitations on her physical ability but noted that she had a head injury and had passed out twice. Id. at 105. The doctor concluded that plaintiff was unable to work. Id. at 106-07.

On July 17, 2001, Dr. Soo Park evaluated plaintiff consultatively. Tr. 108-11. Plaintiff stated that she took 300 milligrams of Dilantin daily and that she had between ten and fifteen seizures per month notwithstanding the medication. Id. at 108. Dr. Park found mild limitations on plaintiff's physical ability and concluded that plaintiff suffered from "grand mal seizures" that were "not well controlled even with medication." Id. at 109. A handwritten note at the bottom of Dr. Park's evaluation indicates that plaintiff's Dilantin level was 0.11, id. at 110, which is confirmed by a lab reported dated July 17, 2001. Id. at 111. The lab report indicated that 10.0-20.0 is the therapeutic range. Id.

Petion, the non-medical consultant, completed a second Social Security report on August 6, 2001, in which he stated that plaintiff complained of suffering between ten and fifteen seizures per month. Petion reported that plaintiff had not visited the emergency room, could not recall her seizures, and did not have any witnesses. Tr. 81. Petion opined, referencing the July 17, 2001 blood test results, that plaintiff was "not following [her] prescribed treatment." Id. at 82. Petion completed an RFC assessment on the same day, finding few exertional limitations. Id. 113. Petion reported that plaintiff was "not in treatment" and that she had been "seen once by Dr. Vujovic." Id. at 118.

Dr. Vujovic saw plaintiff on September 24, 2001. Plaintiff reported that her most recent seizure had occurred the previous week. Tr. 141. The doctor ordered that plaintiff's Dilantin level be taken. Id. In a report dated the same day, the doctor indicated that, following

4

plaintiff's seizure during her pregnancy in September of 1999, seizures continued with increasing frequency. Tr. 120. Dr. Vujovic indicated that plaintiff was unable to work. Id.

Dr. Richard Francisco and Dr. Yaw-Ling Chen saw plaintiff on November 20, 2001. They noted that plaintiff had been prescribed 400 milligrams daily of Dilantin. Tr. 136. The doctors reported that plaintiff's most recent seizure had occurred one month previously and that her last recorded Dilantin level, in September of 2001, had been 1.4. Id. The doctors indicated "mostly no compliance" with plaintiff's prescribed treatment. Id. In a report following a gynecological visit on December 4, 2001, Dr. Calvin Thomas reported that plaintiff stated that she no longer took Dilantin. Id. at 134.

Dr. Win Myint saw plaintiff on March 6, 2002 for a regular checkup. Tr. 132-33 Plaintiff indicated that her most recent seizure had occurred two months earlier. Id. at 133. Plaintiff's Dilantin level was 1.4. Id.

On May 14, 2002, Dr. Claude Killu saw plaintiff. Plaintiff's Dilantin level was less than 0.50. Tr. 128. Dr. Killu noted that plaintiff was on Dilantin for seizure disorder but was not compliant. Id. On October 7, 2002, Dr. Vujovic saw plaintiff, noting that her "Dilantin level [is] low because [patient] does not take Dilantin." Tr. 123. Shortly thereafter, on October 16, 2002, Dr. Vujovic completed an employability report in which he noted that plaintiff's seizure disorder was not controlled and that she was unable to work. Tr. 198.

Dr. Vujovic saw plaintiff on January 13, 2003 and reported that plaintiff's seizure disorder was stable. Tr. 121. He advised plaintiff to continue taking her medication. Id. On July 8, 2003, Dr. Vujovic reported that plaintiff was taking Dilantin and that she was compliant with her medications. Tr. 201. He noted that her Dilantin level was 11.3 milligrams per

5

milliliter, in the therapeutic range. Id. Dr. Vujovic reported that, despite the fact that her Dilantin level was good, plaintiff had suffered a tonic-clonic seizure on July 6, 2003. Id. He attached a laboratory report indicating her Dilantin level. Id.

During her hearing before ALJ Polisar, plaintiff testified that in May of 2002 she had been confused and had taken one-fourth of her prescribed dosage. Tr. 232. She also testified that in August of 2002 she often forgot to take her medication. Id. at 233. Plaintiff further testified that her father, who is sixty-nine, often assists her at home, id. at 229, and that he performs many of the household chores. Id. at 230.

II.     Standard of Review

This case comes to the court for review of the Commissioner's decision that the plaintiff is not disabled. Under the Social Security Act, a disability is defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1). An individual is considered to be under a "disability" if her impairment is of such severity that she is unable to perform her previous work and, given her age, education, and work experience, she is not able to engage in any other type of substantial gainful employment in the national economy. See 42 U.S.C. § 423(d)(2)(A). In determining whether an individual is disabled, the Commissioner is to consider both objective and subjective factors, including "objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain and disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience." Parker v.

Harris, 626 F.2d 225, 231 (2d Cir. 1980) (citations omitted).

In order to establish disability under the Act, a claimant must prove that (1) she is unable to engage in substantial gainful activity by reason of a physical or mental impairment expected to result in death or that had lasted or could be expected to last for a continuous period of at least twelve months; and (2) the existence of such impairment was demonstrated by medically acceptable clinical and laboratory techniques. See 42 U.S.C. §§ 423(d), 1382(a); see also Shin v. Apfel, 1998 WL 788780, at *5 (S.D.N.Y. Nov. 12, 1998) (citing cases).

The SSA has promulgated a five step process for evaluating disability claims. See 20 C.F.R. § 404.1520. The Second Circuit has characterized this procedure as follows:

> "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful employment. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)) (brackets and alteration in original). The plaintiff has the burden of establishing disability on the first four steps of this analysis. On the fifth step, however, the burden shifts to the Commissioner. See Carroll v. Sec'y of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983).

The court's role in reviewing the decisions of the Social Security Administration is

narrowly confined to assessing whether the Commissioner applied the correct legal standards in making his determination and whether that determination is supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Donato v. Secretary, 721 F.2d 414, 418 (2d Cir. 1983). Substantial evidence is defined as "more than a mere scintilla[:]" it is evidence that a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted).

In the instant case, the ALJ undertook the prescribed sequential analysis and found that, while Francisco has a severe impairment, her impairment does not "meet[] the criteria of any of the listed impairments described in the Regulations." Tr. 14. The ALJ then concluded that plaintiff retains the residual functional capacity ("RFC") to "perform work at all levels of exertional activity, including heavy work, with certain exceptions," in light of her non-exertional limitations, including operating a motor vehicle, working with hazardous machinery, and working at unprotected heights Tr. 17. The ALJ reached her conclusion having given consideration to plaintiff's testimony and subjective allegations, determining that her complaints were not credible in light of the medical evidence. Tr. 16. The ALJ also noted that evidence indicating noncompliance with the prescribed course of treatment, specifically plaintiff's failure to use her medication, was significant to her conclusion. Id. She gave limited weight to the opinion of Dr. Vujovic, one of plaintiff's treating physicians, because his conclusion that plaintiff could not work "is not consistent with the physician's own records and with the medical evidence." Id. The ALJ gave some weight to the findings of state agency medical consultants, who found few functional limitations resulting from plaintiff's seizures and who noted noncompliance with medication. Tr. 17. Having concluded that plaintiff retains the RFC to

perform work at all levels of exertional activity, the ALJ noted that, because plaintiff had performed no past relevant work, the burden shifted to the SSA "to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform." Id. Finding that plaintiff has a limited education and no transferrable skills, since she had performed no past relevant work, the ALJ nonetheless concluded that plaintiff "is capable of making a successful adjustment to work which exists in significant numbers in the national economy." Id. at 17-18.

III.    Analysis

The ALJ based her determination that Francisco is not disabled on essentially three findings: (1) that plaintiff's testimony concerning the frequency and severity of her seizures was not credible in light of medical evidence in the record; (2) that plaintiff was regularly non-compliant in taking her prescribed medication; and (3) that despite plaintiff's non-compliance with her prescribed treatment, plaintiff experienced only occasional seizures during the period under review. The court concludes that substantial evidence in the record supports the ALJ's determination.

In order to be a "listed" impairment, a condition must meet all of the elements set out in the definition of a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 523 (1990); Brown v. Apfel, 174 F.3d 59, 64 (2d Cir. 1999). With respect to a seizure disorder, the elements include, among other things: (1) a detailed description of a typical seizure, including all associated phenomena, given by a person other than the claimant; (2) adherence to antiepileptic therapy, confirmed by blood tests; and (3) the occurrence of seizures at a frequency described in the regulations despite compliance with the prescribed drug treatment for at least three months. 20

9

C.F.R. Pt. 404, Subpt. P, App. 1 at 11.00.[2] Substantial evidence in the record supports the ALJ's conclusion that plaintiff did not comply with her prescribed course of treatment and that plaintiff did not suffer from seizures at the requisite frequency.

The record indicates that plaintiff was first prescribed Dilantin for her seizure disorder on August 21, 2000. Tr. 91. The record indicates that plaintiff had suffered her first seizure during the birth of her child approximately ten months earlier and that she had suffered two subsequent episodes. Id. Approximately one month later, plaintiff reported to her neurologist that Dilantin was expensive and that she "sometimes [didn't] take it." Id. at 92. Multiple blood tests over the course of the following two years indicated serum drug levels far below the therapeutic range of 10.00-20.00 mg/ml. Records from June 2001 indicate a Dilantin level of less than 0.50. Id. at 142. On July 17, 2001, plaintiff's Dilantin level was 0.11. Id. at 111. In September of that year, plaintiff's Dilantin level was 1.4, and her physicians reported "mostly no compliance" with her prescribed treatment. Id. at 136. Plaintiff told her gynecologist during a visit on December 4, 2001 that she no longer took Dilantin. Id. at 134. On March 6, 2002, plaintiff's Dilantin level was 1.4. Id. at 133. In May 2002, plaintiff's Dilantin level was less than 0.50. Id. at 128. Plaintiff's doctor reported that she was not compliant and that she should be advised of the risks associated with failure to take the medication. Id. The treating physician upon whom plaintiff relies most heavily, Dr. Vujovic,

---

[2]The court notes that the ALJ evaluated plaintiff's application under listing 11.03, covering petit mal seizures, rather than 11.02, which covers grand mal seizures. This aspect of the ALJ's analysis may have been erroneous in light of the consulting physician's conclusion that plaintiff suffers from grand mal seizures. The ALJ's analysis, however, resting as it did on the plaintiff's credibility, plaintiff's lack of compliance with her prescribed treatment, and the frequency of plaintiff's seizures, would have led to the same conclusion under either listing.

reported on October 27, 2002, that plaintiff's "Dilantin level [was] low because [patient] does not take Dilantin." Id. at 123. The only evidence in the record showing a Dilantin level within the therapeutic range is a letter from Dr. Vujovic dated July 18, 2003 and an accompanying report showing a Dilantin level of 11.3, id. at 201-02, both of which were prepared several weeks after plaintiff's hearing before ALJ Polisar. It bears noting that the ALJ had questioned plaintiff about her compliance during that hearing. Plaintiff testified during the hearing that she had been confused about her prescribed dosage during May of 2002, id. at 232, and that she had often forgotten to take her medication during August of 2002. Id. at 2003. Plaintiff offered no explanation for the other periods during which her Dilantin level was well below the therapeutic range.

Relying on the Regulations and on the Second Circuit's decision in Brown v. Apfel, 174 F.3d 59 (2d Cir. 1999), plaintiff argues that the ALJ had a duty to develop the record with respect to the reasons for her low serum drug levels before denying benefits on the basis of noncompliance. The court finds plaintiff's reliance to be misplaced. In Brown, the plaintiff had been hospitalized following seizure episodes six times during a six month period. On four of these occasions, the plaintiff stated that he had not taken his prescribed medication. Notwithstanding the consulting physician's conclusion that plaintiff's condition was disabling and without questioning the consultant, who testified at the hearing, about the potential link between plaintiff's lapses and the onset of his seizures, the ALJ concluded that the persistence of plaintiff's seizures was largely caused by his failure to take his medication. 174 F.3d at 63. Remanding the case on other grounds, the court commented that the ALJ "came dangerously close both to failing to compile a complete record and to substituting his own opinion for that

11

of a physician." Id. The court found it significant in that case that "the record does not reveal the extent" of plaintiff's noncompliance. Id. Faced with a relatively small quantum of evidence of noncompliance and substantial evidence that the plaintiff suffered frequent and serious seizures, the court considered whether the ALJ had failed in his duty to develop the record. In the instant case, by contrast, the evidence that plaintiff failed to comply with her prescribed treatment is overwhelming. As recounted above, over a period of two years, multiple blood tests demonstrated only trace levels of Dilantin and plaintiff told doctors that she did not take Dilantin. The only indication in the record that plaintiff took Dilantin with any regularity is a laboratory result dated June 24, 2003, completed after the administrative hearing and submitted as supplementary evidence. The same treating physician who relied on these results to conclude that plaintiff was compliant had earlier concluded that plaintiff did not take Dilantin. Id. at 201, 123. The court thus finds the instant case not to be analogous to Brown. As the Social Security Administration has indicated, "[b]lood drug levels reported during the regular course of treatment are usually of more probative value than evidence obtained for the purpose of disability evaluation which shows the blood drug level at one point in time." SSR 87-6. In light of the overwhelming evidence of noncompliance in this case, the court concludes that the ALJ's determination is supported by substantial evidence. Nothing in the record supports plaintiff's argument that her noncompliance was justified. No evidence suggests that plaintiff has limited intellectual capacities or that she is unable to afford the medication, and she testified that she misunderstood her prescribed dosage during only one month. Thus, plaintiff's contentions do not undermine the evidence supporting the ALJ's determination.

The court also finds that the ALJ had ample reason to find plaintiff's subjective complaints to lack credibility and to conclude that plaintiff suffered only occasional seizures despite noncompliance with her prescribed treatment. Although plaintiff told the consulting physician that she had between ten and fifteen seizures a month, Tr. 108, and had told a non-medical consultant that she had ten to fifteen seizures a month and twenty seizures during March of 2001, id. at 81, 80, plaintiff never indicated to her treating physicians that she had seizures with that degree of regularity. On August 21, 2000, plaintiff reported having had three episodes in the previous ten months. Id. at 91. In September of 2000, plaintiff reported that her last seizure had occurred four months earlier. Id. at 94. In December of 2000, plaintiff's seizure disorder was reported as asymptomatic. Id. at 144. On March 23, 2001, she reported that she had a seizure the previous week, id. at 88, and in late July of 2001 she reported that her most recent seizure had occurred a month earlier. Id. at 142, 102. On September 24, 2001, plaintiff reported that she had a seizure the previous week, id. at 141, and on November 20, 2001, she said that her last seizure had occurred the previous month. Id. at 136. On March 6, 2002, plaintiff stated that her last seizure had occurred two months earlier. Id. at 133. The inconsistencies between plaintiff's statements to the consultants and to her treating physicians are glaring. In light of these discrepancies, the ALJ was warranted in concluding that plaintiff's testimony about the frequency and severity of her seizures was not credible. Substantial evidence in the record supports the ALJ's conclusion that plaintiff did not establish that her condition met all of the elements set out in the definition of epilepsy in the Regulations.

Plaintiff also argues that the ALJ erred in concluding that she could perform work that

is available in the national economy. Relying on Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996),

plaintiff argues that, rather than applying the vocational guidelines at 20 C.F.R. Part 404 Subpt.

P, App.2, the ALJ should have consulted with a vocational expert "to determine whether

someone with such a severe seizure disorder could engage in substantial employment."

Plaintiff's Brief at 17. Plaintiff does not contest the ALJ's conclusion that she has normal

exertional capacities. Rather, plaintiff asserts that one who has seizures, and suffers from

accompanying urinary incontinence, suffers from an impairment that significantly limits her

ability to work.[3] Id. at 18-19.

Epilepsy is defined as a nonexertional limitation at 20 C.F.R. § 404.1545(d), and Pratts

and its predecessor, Bapp v. Bowen, 802 F.2d 601 (2d Cir. 1986), stand for the proposition that

the grid rules may not be controlling where a plaintiff suffers from nonexertional limitations

that "significantly diminish" her capacity for work beyond that caused by exertional

impairments. Bapp, 802 F.2d at 605-06. In Bapp, the Second Circuit clarified that where the

---

[3]One of plaintiff's physicians, Dr. Vujovic, reported on three occasions that plaintiff is unable to work. He reported this conclusion in an employability report dated November 11, 2000, Tr. 99, in a form completed for the state agency on June 30, 2001, id. at 102-07, and in a letter dated September 24, 2001. Id. at 120. The court notes, preliminarily, that the determination that a plaintiff is unable to work is an administrative finding within the purview of the ALJ and that a conclusory statement to that effect by a treating physician is not entitled to controlling weight. 20 C.F.R. § 404.1527(e)(1). Moreover, Dr. Vujovic provided no explanation for his conclusion that plaintiff could not work, noting largely normal physical abilities, Tr. at 102-04, before asserting, without addressing plaintiff's RFC, that plaintiff is "not able to work." Id. at 106-07. As the ALJ noted, certain of Dr. Vujovic's opinions are also inconsistent. Specifically, he noted on October 27, 2002, that plaintiff was not taking Dilantin, id. at 123, and in a post-hearing letter to the ALJ indicated that plaintiff was compliant with her prescribed treatment without mentioning any lapses. Id. at 201. As the ALJ further noted, Dr. Vujovic is not a neurologist, was not responsible for plaintiff's neurological treatment at Woodhull, and saw plaintiff less frequently than other physicians. For the foregoing reasons, the court concludes that the ALJ was justified in giving Dr. Vujovic's opinion limited weight.

14

nonexertional limitation has "a negligible effect, still leaving a wide range of work capability within the functional level," there is still meaningful employment opportunity and the introduction of vocational expert testimony is not required. Id. at 606n.1. The SSA has indicated that "[a] person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels," SSR 85-15, and under Bapp, no vocational expert testimony is required in such cases. See Bentinez v. Apfel, No. 97 Civ. 4632 (RJD), 1998 WL 564537, *7 (E.D.N.Y. July 15, 1998) (finding that the ALJ properly rendered his decision, without the testimony of a medical vocational expert, that epileptic plaintiff was only prohibited from jobs that involved operating machinery or working around heights); Gamble v. Barnhart, No. 02 Civ. 1126 (GBD) (THK), 2004 WL 2725126, *2 (S.D.N.Y. Nov. 29, 2004) (affirming the ALJ's conclusion that epileptic plaintiff could perform work within all ranges with the exception that plaintiff could not operate a motor vehicle, work around heavy machinery, or climb in hazardous areas).

In the instant case, the ALJ determined that plaintiff's non-exertional limitations "narrow[ed] the range of work which she can perform," Tr. 17, concluding that plaintiff has the RFC to perform work at all exertional levels but that she is "restricted in an ability to operate a motor vehicle, an inability to work with hazardous machinery, [and] an inability to climb or work at unprotected heights." Id. at 18. In light of the foregoing, the court sees no legal error in the ALJ's analysis.

## CONCLUSION

For the above stated reasons, the defendant's motion for judgment on the pleadings is granted and the plaintiff's cross-motion is denied. The court affirms the Commissioner's decision.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: April 26, 2005
       Brooklyn, New York

SERVICE LIST:

Attorney for Plaintiff
Toby Golick
Cardozo Bet Tzedek Legal Services
55 Fifth Avenue
New York, NY 10003

Attorney for Defendant
Leslie A. Ramirez-Fisher
Office of United States Attorney
Eastern District of New York
One Pierrepont Plaza
Brooklyn, New York 11201